ANTHONY A. HUGHES

v.

WILLIAM YOUNG and wife.

1. A person was employed to find a purchaser for a piece of property, the price to be fixed by the vendor. Having found a purchaser, with whom the vendor agreed as to the price,—*Held*, that the conduct of the agent having been fair, no further duty was imposed upon him in the matter, by reason of such special, qualified agency.

2. The purchaser was to give a mortgage for part of the purchase-money. He offered to pay the whole in cash, if desired.—*Held*, that, under the circumstances, the fact of his insolvency would not avail as a defence against specific performance.

3. The buyer did not disclose the fact that he was, in fact, purchasing for another person.—*Held*, that he was under no duty to disclose his principal.

Bill for specific performance of agreement for sale of lands, and bill, in the nature of a cross-bill, to set aside the agreement. On final hearing on pleading and proofs.

*Mr. J. Garrick* and *Mr. William A. Lewis*, for complainant.

*Mr. Charles H. Hartshorne*, for defendants.

THE CHANCELLOR.

The original bill is filed to compel specific performance of an agreement made on the 27th of August, 1877, between the defendants in that bill, William Young and his wife of the one part, and Anthony A. Hughes of the other, for the sale and conveyance by the former to the latter of a lot of land and premises on Newark avenue, in Jersey City. On the avenue there is a brick building, and on the rear of the lot a wooden building. The price fixed in the agreement was $13,000, of which $6,000 were to be paid in cash, and the balance to be secured by a bond and mortgage on the premises, payable in

five years, with interest. The deed was to be delivered on the 15th of September, 1877. The agreement provided that the property was to be sold free and clear of all encumbrances to the date of the deed, and that Joseph Warren, the agent for selling the property, was to receive $200 as his commissions for selling. By an endorsement on the agreement, it was declared that the property was sold subject to a lease given to one Piaget, and, by another endorsement on the instrument, Hughes agreed to take the property subject to that lease.

A bill in the nature of a cross-bill was exhibited against the complainant, Joseph Warren, before mentioned, William E. Flemming and Joseph Moore. It seeks to set aside the agreement on the ground of duress and evil practice on the part of Warren and Hughes. It states that Warren, being a general agent for the sale and exchange of real estate in Jersey City, in the summer of 1877 applied to the complainant, William Young, and offered to procure a purchaser for the property, and that the latter accepted the proposition, but declared that he would not sell the property for less than $18,000; that Warren at that time was, and for a long time previously thereto had been, the agent of Young to let the house on the rear of the lot, and had collected the rents thereof for him, and that he had been previously employed as his agent for the renting and collection of the rents of other pieces of Young's property. It further states that, on or about the 25th day of August, 1877, Warren called on Young and his wife and urged them to sell the property for $12,000; that they refused to sell at that price, and that Warren then requested them to show him the lease before mentioned, made to Piaget, which was for the term of five years, to commence on the 1st day of May then next, on which was reserved an annual rent of $1,350, to be paid in equal monthly payments; that Warren, on examining it, falsely stated that the lessee was not worth a dollar, and that by the terms of the lease the lessee could remain in possession of the land for twelve months,

without paying any rent, and added that no one would buy the property with that lease upon it. It further states that Young and his wife are persons of advanced age, he being seventy and she sixty years old; that the former is quite deaf and can only hear with difficulty what is said in conversation; that neither of them is of strong or vigorous mind and will, and both are ignorant of business, such as the sale of property; that the wife can neither read nor write; that Warren is a shrewd, sharp and experienced man and real estate agent, and has been for many years engaged in that business; that Young and his wife, fearing that Warren's misrepresentations about the lease might be true, were greatly alarmed and confused by them; that on the 27th of August, two days afterwards, Warren, in company with the complainant, Hughes, called on Young and his wife at their house and asked them to sell the property to Hughes, and to name their price for it; that she named $20,000; that Warren thereupon arose from his chair, and in an excited manner walked up and down the room, and spoke loud and angrily, and told Young's wife to "say something reasonable," or words to that effect, and otherwise, by gesture and words, acted and spoke in a manner calculated to alarm, confuse and intimidate Young's wife; that Warren said that Hughes would pay $13,000 for the property, and that was all it was worth, and urged Young and his wife to sell for that sum; that they were excited and confused by his manner and language, and were influenced to yield to his urgency by his previous misrepresentations about the lease; that he then prepared a writing purporting to be an agreement (being the agreement mentioned in the bill in the suit for specific performance) between them of the one part and Hughes of the other, whereby they were to sell the latter the property, free from encumbrance, for $13,000, of which $6,000 were to be paid in cash and $7,000 to be secured by Hughes's bond and a mortgage upon the property payable in five years; that Warren inserted in the agreement a statement that he, as the agent for selling the property, was

to receive from Young and his wife $200 commission; that Young and his wife objected to signing the paper, saying that Young wished to consult with his friends and counsel about it before doing so, but Warren and Hughes both urged him to sign at once; that Young and his wife, in their confusion and excitement, yielded to their importunities and signed the paper, and that Hughes then paid to Young and his wife $25 on account of the price.

The cross-bill charges that Warren, after becoming the agent of Young for the sale of the property, fraudulently, and without the knowledge or consent of Young and his wife, agreed with Hughes, or with some other of the defendants in the cross-suit, to procure a sale of the property by Young and his wife for a sum less than that which they were willing to accept; that Hughes is, and was at the time of the sale, insolvent, and that Warren was well acquainted with him and knew that fact, but concealed it from Young and his wife; that they did not know or suspect it until after they had signed the agreement. The bill further states that the wife of Hughes (to whom Hughes had, subsequently to the making of the agreement, directed that the deed should be made instead of to himself) has not the means with which to purchase the property, and that neither he nor his wife has relations possessed of such means as that they would be likely to advance to them money sufficient for the purchase; that the front house on the property, being the brick house, was, at the time of filing the bill, leased to Joseph C. Moore, one of the defendants, who kept a store there and carried on the business of pharmacy therein, and whose term in that property expired on the 1st day of May then next; that Moore's wife is a daughter of the defendant Flemming, and that Flemming and Moore reside together in the same house in Jersey City; that Moore is generally reputed to be a man of small means, but Flemming is said to be possessed of large wealth; that about the time of making the lease to Piaget, during the month of July, 1877, Flemming applied to Young and requested him to sell the

property to him for $12,000, which Young refused to do; that Moore, shortly before the sale to Hughes, in conversation with Young, decried the property, and said to Young that if it had been sold for $12,000 to Flemming, Young would have been better off by $400 a year, and added that Flemming would not have the property then (at the time of the conversation) for the taxes. The bill further states, in substance, that the purchase was, in point of fact, made by Flemming or Moore through Hughes, and that Warren knew, at the time of the sale to Hughes, that Hughes was, in fact, purchasing the property for Flemming or Moore, and that he fraudulently concealed that fact from Young and his wife. It charges that Hughes and Flemming and Moore fraudulently combined with Warren, as the agent of Young for the sale of the land, to procure from Young a sale for less than its fair value.

After a careful consideration of the testimony in the case, I am satisfied that the relief prayed by the cross-bill should not be granted. It appears that Warren occupied towards Young the relation of agent only in respect to the renting of part of his property and collecting the rents; that, as to the sale of the property, Warren was vested with no discretion, and had no power to bind Young, and was not in any way charged with a care for Young's interest in selling. The price, according to the cross-bill, was fixed by Young himself, and it appears, by the testimony, that Warren had leave only to find a purchaser for the property, but the price was to be fixed by Young.

Nor does the proof appear to justify the statements and charges in the cross-bill in respect to the alleged duress under which the complainants in that bill say the agreement was made. The conduct of Warren appears to have been fair. Although, when the lease to Piaget was shown to him by Young and his wife, he, at first, thought, and so said, that the rent was payable only at the end of the year, it being, by the terms of the lease, made payable " twelve-monthly," he subsequently and in the same conversation

concluded that he was in error on that point, and that the rent was payable monthly, and so informed Young and his wife. He denies that he said that Piaget was a man of no property, although he admits that he expressed some doubts on the subject. The evidence as to the want of capacity of Young and his wife to transact business, fails to establish their want of competency, but, on the other hand, shows that they were capable of managing their own business; and the defect of hearing of the former is shown to be greatly exaggerated.

Much stress was laid, on the argument, upon the circumstance that Hughes, who appears to have purchased for Moore, did not disclose the fact that he was not purchasing for himself. The concealment, however, was of no importance. The property was subject to a long lease to Piaget, so that Moore, whose lease expired in May, 1877, could not have expected to obtain possession of the property for a long period of time. It is not to be presumed, therefore, that a large price could have been obtained from him for the property, by reason of the fact that he was established there, and it would be to his disadvantage to be compelled to remove to another place of business. Besides, the agent was under no duty to disclose his principal in the premises.

Nor will the fact of the insolvency of Hughes, if it be conceded, under the circumstances, affect the liability of Young to be compelled to specifically perform his agreement, for it appears that Hughes offered to pay the entire amount of the purchase-money in cash. Nor does there appear, in the price at which the property was sold, to be any ground for objection to the agreement on the score of inadequacy.

The price mentioned in the agreement is $13,000. A number of witnesses are produced, on the part of Young, to testify as to the value of the property. Mr. Weart estimates the value of the lot at $12,000, and that of the buildings at from $3,000 to $4,000. He says that he is not very familiar with the buildings, particularly the rear building;

but he thinks the property ought to bring $15,000, if a reasonable credit were given. He also says that the buildings are old. Mr. Kingsland puts the value of the lot at from $12,000 to $13,000, and the value of the buildings at $3,000. He says, however, that he has not had occasion to examine the property for many years, though he adds that he knows it very well. Mr. Dugan gives it as his opinion that the lot, without the buildings, would probably bring $10,000 to $12,000; that it was assessed at $9,500, and the assessor is supposed to assess the property at the amount which it would bring, in cash, if sold on the day the assessment is made, but, he says, the practice has been to assess at one-third less than the market value. He adds that, in his judgment, the lot, with the buildings, is worth $15,000; but, at the assessment, with the addition of one-third, it would be worth only $12,666. He says he does not regard the rear building as being worth anything; that it has no value. Mr. Hemmingway is the owner of property on Newark avenue, the lot next to the property in question. He has improved his property, building upon it a four-story brick building, which cost him about $11,000. He gave for his lot $14,800, eight years prior to the time when he testified in 1878. He says he considered that, when he bought, he paid an enormous price for his property, and so considered it afterwards, and has often been sorry that he bought it; that it has depreciated in value since he purchased it; that, at the time when he testified, he considered the value of the land, not counting the building, at $10,000 to $12,000, and he considers the value of Young's lot, without the buildings, $10,000 or $11,000; that, if he had more money than he knew what to do with, he might give $11,000 for it, and that the building is a mere shell. He says that he considers the Young property (the property in question in this suit), according to the present market, not worth over $12,000 or $14,000 at the outside, and that he would not give over $13,000 for it, though he might give $13,500. Mr. Carswell puts the value of the property at

$11,000. Mr. Crane values it at about $12,000. Mr. Leake is the owner of a neighboring property, on the same street, of at least equal value with that in question. He swears that $11,600 was the best price he could get for it at a public sale, in March, 1877, though three years and a half before that time he was offered, by Mr. Warren, $22,500; and he adds that he sold the property, in November, 1877, for $10,750.

The bill in the nature of a cross-bill will be dismissed, with costs, and there will be a decree for specific performance in this suit.